NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-3043
_____

JOHN FIORE,
　　　　　　　　　　Appellant

v.

CITY OF BETHLEHEM;
MAYOR JOHN CALLAHAN,
Individually and in his official capacity as Mayor of the City of Bethlehem;
POLICE COMMISSIONER RANDALL MILLER,
Individually and in his official capacity as Police Commissioner of the Bethlehem
Police Department;
DEPUTY POLICE COMMISSIONER STUART BEDICS,
Individually and in his official capacity as Deputy Police Commissioner of the
Bethlehem Police Department;
FORMER LIEUTENANT DAVID STRAWN,
Individually and in his official capacity as a former member of the Bethlehem
Police Department;
LIEUTENANT ROBERT MITCHELL,
Individual and in his official capacity as a member of the Bethlehem Police
Department;
FORMER SERGEANT SCOTT PARRY,
Individually and in his official capacity as a former member of the Bethlehem
Police Department;
INVESTIGATOR SCOTT FELCHOCK,
Individually and in his official capacity as a member of the Bethlehem Police
Department;
INVESTIGATOR CHRISTOPHER BEEBE,
Individually and in his official capacity as a member of the Bethlehem Police
Department;

OFFICER ROBERT URBAN,
Individually and in his official capacity as a member of the Bethlehem Police Department;
OFFICER LOUIS CSASZAR,
Individually and in his official capacity as a member of the Bethlehem Police Department;
OFFICER RONALD BRAZINSKI,
Individually and in his official capacity as a member of the Bethlehem Police Department;
OFFICER MICHAEL MANFREDO,
Individually and in his official capacity as a member of the Bethlehem Police Department;
OFFICER CHRISTOPHER YERK,
Individually and in his official capacity as a member of the Bethlehem Police Department; and
OFFICER MOSES MILLER,
Individually and in his official capacity as a member of the Bethlehem Police Department.

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
District Court No. 5-09-cv-04247
District Judge: The Honorable Juan R. Sanchez

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
January 14, 2013

Before: SMITH, CHAGARES, and BARRY, _Circuit Judges_

(Filed: January 18, 2013)

_____

OPINION

_____

SMITH, *Circuit Judge.*

.

After being arrested pursuant to a warrant for allegedly threatening his wife, John Fiore sued the arresting officers, their superiors, the mayor of the City of Bethlehem, and the city for arresting him without probable cause. The District Court held that the officers were entitled to qualified immunity and granted summary judgment in their favor. Because Mr. Fiore's right to be free from arrest pursuant to the warrant issued in this case was not clearly established at the time of his arrest, we will affirm the District Court's grant of summary judgment.

I.

A.    Factual Background

In February 2007, Mariemma Fiore told her husband, a police officer with the Lehigh Valley Airport and Moore Township Police Department, that she wanted a divorce. Mr. Fiore[1] began acting erratically—behavior that escalated when Ms. Fiore repeated her desire for a divorce on September 3, 2007.

In September, the Fiores' relationship continued to deteriorate. On September 10, Mr. Fiore's yelling during an argument caused his daughter and two of her friends to become concerned that he would physically assault Ms. Fiore. Four days later, Jim Cavallo (Mr. Fiore's former chief at Moore Township Police Department and a family

---

[1] We, like the District Court, refer to John Fiore as "Mr. Fiore" and Mariemma Fiore as "Ms. Fiore."

friend) called Ms. Fiore to express his unease at Mr. Fiore's recent behavior. Ms. Fiore asked Cavallo to advise Mr. Fiore to seek counseling, which Cavallo did.

But Cavallo's advice did not alleviate the tension. After Mr. Fiore returned home from work on September 18, the Fiores returned to their discussion of divorce. Mr. Fiore became increasingly anxious, saying that he could not handle the situation, that he had lost everything, and that he had no family. According to Ms. Fiore, he "flipped out," yelled that he could not take it anymore, and left the house "wild-eyed" to smoke a cigarette. Ms. Fiore grew afraid that he would kill her or himself.

This strife culminated the next day in a conversation between Mr. Fiore and Lydia Lopez, Ms. Fiore's mother who lived with the Fiores. After recounting the previous night's heated conversation between himself and Ms. Fiore, Mr. Fiore told Lopez that he could not take it anymore. Mr. Fiore then asked Lopez if she had heard about a local news story from the previous day in which a police officer, Derrek Duh, had killed his wife and then himself because of escalating marital discord. Lopez responded by telling Mr. Fiore that "it wasn't worth it" before Mr. Fiore left for work.[2] Lopez apprised Ms.

---

[2] In an affidavit, Mr. Fiore contends that he made several comments after referring to the Duh murder-suicide that made clear that his reference to the Duh murder-suicide was not a threat. *See* Fiore Aff., App. 18 ¶ 15 (stating that he condemned the Duh murder-suicide, that he refused to join his colleagues in wearing black arm bands in honor of Officer Duh, and that Officer Duh did not deserve the "hero's funeral" he was receiving). Mr. Fiore does not provide any evidence, however, that the arresting officers knew of this additional information at any time. Consequently, we cannot consider these comments in evaluating the reasonableness of the arrest. *See Orsatti v. N.J. State Police*, 71 F.3d 480, 486 (3d Cir. 1995) ("[W]e must determine whether an arrest was

Fiore of this conversation when Ms. Fiore subsequently returned home from work. After hearing about Mr. Fiore's reference to the Duh murder-suicide, Ms. Fiore worried that Mr. Fiore was "going to do" the same, a concern shared by Lopez.

Prompted by her anxiety over her own safety, Ms. Fiore took action. The following day (September 20), she told her story to a marriage counselor, who contacted a crisis hotline for her. Ms. Fiore subsequently met with officers at the Bethlehem Police Department to apply for an emergency Protection from Abuse Order against her husband. She told Officer Moses Miller, the police officer interviewing her, that she was afraid her husband would kill her. Ms. Fiore also provided the officers with a written statement describing the events of the preceding weeks.

As required by county policy before making a domestic-violence arrest, Officer Miller contacted the assistant district attorney in charge of the domestic-violence unit, Jacqueline Taschner. After interviewing Ms. Fiore, ADA Taschner instructed Officer Miller to charge Mr. Fiore with making terroristic threats and harassment. Officer Miller conducted a follow-up investigation by interviewing Lopez. Lopez confirmed Mr. Fiore's reference to the Duh murder-suicide, her fear that Mr. Fiore would harm Ms. Fiore or himself, and the distress that it caused Ms. Fiore.

The same day, Officer Miller followed ADA Taschner's instructions by charging Mr. Fiore with terroristic threats and harassment in violation of Pennsylvania law. In

---

objectively reasonable on the basis of the information the officers had available at the time of arrest, not thereafter.").

support of this criminal complaint, Officer Miller prepared a probable-cause affidavit. The affidavit explained Ms. Fiore's report of her husband's "erratic" and "explosive" behavior; his statements that he had "nothing to lose" and had "lost everything"; and his conversation with Lopez, including the reference to the Duh murder-suicide. The affidavit also briefly described how this series of events caused Ms. Fiore to "fear[] for her life" and her children's lives. ADA Taschner, Officer Miller, and Ms. Fiore then presented this information to a Pennsylvania magisterial district judge, who issued a Protection from Abuse Order and an arrest warrant for Mr. Fiore.

With the arrest warrant in hand, Lieutenant David Strawn assembled a team of officers, including himself and Officer Miller, to execute the warrant. Upon arriving at the Fiores' house, Lieutenant Strawn, Officer Miller, and a third officer approached the front porch while the rest of the team secured a perimeter around the house. After Mr. Fiore answered the door, Lieutenant Strawn explained that he had a warrant to arrest Mr. Fiore and then entered the Fiores' home. At that time, Mr. Fiore, Lopez, and the Fiores' eight-month-old daughter were present in the house. Officer Miller and the other officer remained on the front porch.

Once inside, Lieutenant Strawn asked Lopez about Mr. Fiore's threat. With Mr. Fiore present, Lopez explained that while Mr. Fiore had never threatened his wife, his continual references to the Duh murder-suicide, coupled with their escalating marital strife and his increasingly erratic behavior, made Ms. Fiore fear for her life. According to Mr. Fiore, Lieutenant Strawn then questioned whether probable cause still existed for

6

the arrest warrant.[3] Because he was unfamiliar with the details of the investigation preceding the issuance of the warrant, however, Lieutenant Strawn's doubts did not deter him from arresting Mr. Fiore pursuant to the warrant.

After being taken into custody, Mr. Fiore was subsequently arraigned on the terroristic-threat and harassment charges in the criminal complaint. On August 18, 2008, the district attorney dismissed the charges against Mr. Fiore due to insufficient evidence.

B.     Procedural Background

Mr. Fiore, however, wanted more than a dismissal of the charges against him. In September 2009, Mr. Fiore sued the arresting officers (Lieutenant Strawn, Officer Miller, and nine other current and former Bethlehem City police officers), the City of Bethlehem, the mayor, the police commissioner, and the deputy police commissioner under 42 U.S.C. § 1983. As relevant here, he alleged that the defendants were liable for abuse of process, malicious prosecution, false arrest, false imprisonment, illegal search and seizure, and violating his right to due process.[4] Mr. Fiore also alleged municipal

_____

[3] In his deposition, Lieutenant Strawn stated that he did not remember making these comments, though he acknowledged that he might have done so.

[4] Mr. Fiore also alleged the following claims, which were not implicated by the District Court's summary-judgment decision and are not relevant to this appeal: excessive force in violation of the Fourth Amendment (Count 5), the individual defendants' supervisory liability under 42 U.S.C. § 1983 (Count 7), municipal liability against the City of Bethlehem (Count 8), civil conspiracy by the individual defendants under § 1983 (Count 9), intentional infliction of emotional distress (Count 10), assault and battery (Count 11), negligent infliction of emotional distress (Count 12), and violation of the Pennsylvania Constitution (Count 14).

liability under § 1983 against the City of Bethlehem. All of these claims arose from his arrest pursuant to the warrant.

The officers moved for summary judgment on these claims, arguing that they were entitled to qualified immunity. The District Court agreed, reasoning that Mr. Fiore's right to be free from arrest pursuant to the warrant issued in this case was not clearly established when he was arrested. As a result, the District Court granted summary judgment in the officers' favor on these claims.[5] Mr. Fiore then timely appealed the District Court's grant of summary judgment to this Court.[6]

## II.

We review the District Court's grant of summary judgment *de novo*, applying the same standards that the District Court did in determining whether summary judgment was appropriate. *Kelly v. Borough of Carlisle*, 622 F.3d 248, 253 (3d Cir. 2010). "Viewing the evidence in the light most favorable to the nonmovant, summary judgment is appropriate only if there is 'no genuine issue as to any material fact [such] that the moving party is entitled to judgment as a matter of law.'" *Id.* (quoting *Giles v. Kearney*, 571 F.3d 318, 322 (3d Cir. 2009)); *see* Fed. R. Civ. P. 56(a). "'The mere existence of some evidence in support of the nonmovant is insufficient to deny a motion for summary

---

[5] The parties agreed to dismiss (with prejudice) all counts remaining after the District Court's grant of summary judgment.

[6] The District Court exercised federal-question jurisdiction over Mr. Fiore's § 1983 claims, *see* 28 U.S.C. § 1331, and supplemental jurisdiction over his state-law claims, *see* 28 U.S.C. § 1367. Because the District Court's granted summary judgment on some of

judgment; enough evidence must exist to enable a jury to reasonably find for the nonmovant on the issue.'" *Kelly*, 622 F.3d at 253 (quoting *Giles*, 571 F.3d at 322).

The doctrine of qualified immunity insulates government officials "'from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Messerschmidt v. Millender*, 565 U.S. ___, ___, 132 S. Ct. 1235, 1244 (2012) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Qualified immunity thus "'gives government officials breathing room to make reasonable but mistaken judgments,' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. ___, ___, 131 S. Ct. 2074, 2085 (2011)). A two-part test determines whether an official is entitled to qualified immunity. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). Under this *Saucier* test, we ask (1) whether a constitutional violation occurred and (2) whether the right at issue was clearly established at the time of the alleged misconduct. *Id.*; *see also Kelly*, 622 F.3d at 253. While *Saucier*'s two-prong test remains valid, its "order of battle" is no longer required; courts may address the two prongs of the *Saucier* test in either order at their discretion. *Pearson*, 555 U.S. at 236. If the plaintiff fails to satisfy either prong, the defendant is entitled to summary judgment. *Id.* at 232.

---

Mr. Fiore's claims and the rest were voluntarily dismissed, we have jurisdiction over Mr. Fiore's appeal under 28 U.S.C. § 1291.

III.

The District Court held that the arresting officers were entitled to qualified immunity because it was not clearly established that they lacked probable cause to arrest Mr. Fiore. We agree.[7]

Mr. Fiore starts at a severe disadvantage. Because the officers relied on ADA Taschner's legal advice in securing the arrest warrant, we must presume that they are entitled to qualified immunity. *See Kelly*, 622 F.3d at 255–56 ("[W]e hold that a police officer who relies in good faith on a prosecutor's legal opinion that the arrest is warranted under the law is presumptively entitled to qualified immunity from Fourth Amendment claims premised on a lack of probable cause."). Indeed, Mr. Fiore's uphill climb is even steeper: the arresting officers not only relied on ADA Taschner's advice that probable cause existed, but they also obtained an arrest warrant from a neutral

---

[7] Because the parties agreed to dismiss Mr. Fiore's municipal-liability claim, the City of Bethlehem is not implicated as a defendant in this appeal. Likewise, Mayor Callahan, Police Commissioner Miller, and Deputy Police Commissioner Bedics are not implicated as defendants by this appeal because the parties agreed to dismiss Mr. Fiore's supervisory-liability claim and Mr. Fiore does not argue that they had any personal involvement in the execution of the arrest warrant. *See Santiago v. Warminster Twp.*, 629 F.3d 121, 129 (3d Cir. 2010) (holding that a supervisor might be liable "if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations"); *Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (holding that § 1983 liability cannot be premised solely on a theory of respondeat superior). Lastly, Mr. Fiore does not challenge the District Court's grant of summary judgment on his state-law claim for abuse of process. By not raising this issue in his opening brief on appeal, he has waived it. *See FDIC v. Deglau*, 207 F.3d 153, 169 (3d Cir. 2000). Consequently, only the qualified immunity of the individual defendants is the subject of this appeal.

magistrate.[8]  *See Messerschmidt*, 132 S. Ct. at 1245. ("[T]he fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or, as we have sometimes put it, in 'objective good faith.'" (quoting *United States v. Leon*, 468 U.S. 897, 922–23 (1984))).

Of course, the officers' reliance on an arrest warrant does not automatically mean that Mr. Fiore's arrest was objectively reasonable. Mr. Fiore may still succeed by showing that no reasonable officer could have believed there was probable cause despite the existence of the warrant.

This he cannot do. He argues that the arrest warrant was "based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *United States v. Pavulak*, 700 F.3d 651, 664 (3d Cir. 2012) (quoting *United States v. Stearn*, 597 F.3d 540, 561 & n.19 (3d Cir. 2010)). The probable-cause affidavit, though lean, was not the sort of skeletal affidavit that is too weak to support the shield of qualified immunity. *See id.* (collecting examples of "bare bones" affidavits). Rather, the affidavit contained sufficient facts to establish probable cause to believe that Mr. Fiore had made terroristic threats against his wife in violation of Pennsylvania law. Under 18 Pa. Cons. Stat. § 2706(a)(1), a person is guilty of making a terroristic threat when he "communicates, either directly or indirectly, a threat to commit any crime of violence with intent to terrorize another." Here, the affidavit relied on first-hand

---

[8] We use the term "magistrate" generally, referring to any member of the state or federal judiciary authorized to issue warrants (though in this case, a state issuing authority).

information from Lopez about Mr. Fiore's reference to the Duh murder-suicide and an interview with Ms. Fiore about her fear that the reference foreshadowed his taking similar action in the context of their escalating marital conflict.

To be sure, Mr. Fiore indirectly made his alleged threat against Ms. Fiore through Lopez and his allusion to the Duh murder-suicide was somewhat ambiguous in isolation. Nor did his remark specify the action he intended to take, if any, against Ms. Fiore. But none of those limitations prevents a remark from meeting the definition of a terroristic threat under Pennsylvania law. *See Commonwealth v. Kelley*, 664 A.2d 123, 127 (Pa. Super. Ct. 1995) ("[D]irect communication of threat between the perpetrator and the victim is not a requisite element of the crime of terroristic threats."); *Commonwealth v. Campbell*, 625 A.2d 1215, 1219 (Pa. Super. Ct. 1993) ("[I]t is unnecessary for [the defendant] to specifically articulate the crime of violence which he or she intends to commit where the type of crime may be inferred from the nature of the statement and the context and circumstances surrounding the utterance of the statement." (citation and internal quotation marks omitted)).

Mr. Fiore offers several arguments to rebut the existence of probable cause, all of which are unpersuasive. He points to Lieutenant Strawn's observations during the arrest that there was no probable cause to arrest Mr. Fiore, but "the arresting officer's subjective beliefs about the existence of probable cause are not relevant." *Berg v. Cnty. of Allegheny*, 219 F.3d 261, 272 (3d Cir. 2000) (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). Mr. Fiore says that the prosecutor's later dismissal of the charges

12

against him due to insufficient evidence equates to a determination that no probable cause existed for his arrest, but probable cause does not "require the same type of specific evidence . . . as would be needed to support a conviction." *Reedy v. Evanson*, 615 F.3d 197, 211 (3d Cir. 2010) (quoting *Adams v. Williams*, 407 U.S. 143, 149 (1972)); *see also United States v. Watson*, 423 U.S. 411, 431 n.4 (1976) (Powell, J., concurring) ("Whatever evidence may be necessary to establish probable cause in a given case, however, it is clear that it never need rise to the level required to prove guilt beyond a reasonable doubt."). And Mr. Fiore complains that the officers violated several state restrictions on their authority to conduct searches, but more restrictive state regulations do not affect what the Fourth Amendment requires. *See Virginia v. Moore*, 553 U.S. 164, 174 (2008) ("A State is free to prefer one search-and-seizure policy among the range of constitutionally permissible options, but its choice of a more restrictive option does not render the less restrictive ones unreasonable, and hence unconstitutional."); *id.* at 176 ("[W]hile States are free to regulate such arrests however they desire, state restrictions do not alter the Fourth Amendment's protections.").

Nor did Lopez's statements to Lieutenant Strawn during the arrest erase the probable cause that existed for the warrant. During Mr. Fiore's arrest, Lieutenant Strawn asked Lopez about the threat Mr. Fiore made against his wife. In Lieutenant Strawn's words, Lopez said that Mr. Fiore "never threatened [Ms. Fiore] but he did keep talking about the [Duh murder-suicide] and it scared [Ms. Fiore]." Of course, a valid warrant does not immunize an officer from suit if "his reliance on it is unreasonable" in light of

13

"other information that the officer possesses or to which he has reasonable access." *Berg*, 219 F.3d at 273. But Lopez's answer to Lieutenant Strawn hardly makes the officers' reliance on the warrant unreasonable. In fact, her answer confirmed the probable cause for the arrest warrant: while Mr. Fiore never directly threatened Ms. Fiore, his repeated references to the Duh murder-suicide and the context in which he made the references constituted indirect threats. Her explanation to Lieutenant Strawn during Mr. Fiore's arrest is therefore insufficient to rebut the strong presumption that the officers were entitled to reasonably rely on ADA Taschner's advice and the arrest warrant.

Indeed, the officers "took every step that could reasonably be expected of them" before arresting Mr. Fiore. *Messerschmidt*, 132 S. Ct. at 1249 (quoting *Massachusetts v. Sheppard*, 468 U.S. 981, 989 (1984)). They interviewed the witness (Lopez) and the victim (Ms. Fiore); sought legal advice from ADA Taschner, who conducted her own investigation before advising the officers; prepared a probable-cause affidavit; and obtained an arrest warrant from a neutral magistrate. We would not expect officers under the circumstances in this case to question the validity of the arrest warrant.

In short, Mr. Fiore has not scaled the "high" threshold for showing that no officer could have reasonably relied on the arrest warrant's determination of probable cause. *Messerschmidt*, 132 S. Ct. at 1245. He has not shown that "every reasonable official" would have understood that, despite the issuance of an arrest warrant, there was no probable cause for Mr. Fiore's arrest. *Reichle v. Howards*, 566 U.S. ___, 132 S. Ct.

14

2088, 2093 (2012) (citation and internal quotation marks omitted). The officers are therefore entitled to qualified immunity.

Accordingly, we will affirm the District Court's grant of summary judgment in favor of the Defendants.